John P. Aldrich, Esq.
Nevada Bar No. 6877
**ALDRICH LAW FIRM, LTD.**
7866 W. Sahara Avenue
Las Vegas, NV 89117
Tel: (702)853-5490
Fax: (702) 227-1975
jaldrich@johnaldrichlawfirm.com
*Attorneys for Plaintiff*

[*Additional counsel on signature page*]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| JOHN D. LAWSON, individually and on behalf of all other similarly situated, | ) ) ) **CONSOLIDATED C.A. NO. 3:18-cv-00284-LRH-CBC** |
| Plaintiff, | ) |
| v. | ) **FIRST AMENDED** ) **CONSOLIDATED CLASS** ) **ACTION COMPLAINT FOR** |
| KLONDEX MINES LTD., RODNEY COOPER, MARK DANIEL, JAMIE HAGGARTY, RICHARD J. HALL, PAUL ANDRE HUET, WILLIAM MATLACK, CHARLES OLIVER, BLAIR SCHULTZ, | ) **VIOLATION OF FEDERAL** ) **SECURITIES LAWS** ) ) **JURY TRIAL DEMANDED** ) ) |
| Defendants. | ) ) |

## NATURE AND SUMMARY OF THE ACTIONS

Plaintiff John D. Lawson ("Plaintiff"), by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows: Plaintiff, a former stockholder of Klondex Mines Ltd. ("Klondex" or the "Company"), brings this action individually and on behalf of the stockholders of Klondex Mines Ltd. ("Klondex" or the "Company") against the former members of the Board of Directors (the "Board" or the

"Individual Defendants") of Klondex for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rules 14a-9, 17 C.F.R. 240.14a-9, 17 C.F.R. § 244.100, and 17 C.F.R. § 229.1015(b)(4), arising out of the merger between the Company, Hecla Mining Company ("Hecla") and 1156291 B.C. Unlimited Liability Company ("Merger Sub").

1.       On March 19, 2018, Hecla and the Company announced they had entered into an Agreement and Plan of Merger ("Merger Agreement"), by which Hecla, through its wholly owned subsidiary, Merger Sub, would acquire all of the outstanding shares of Klondex in a cash and stock transaction in which Klondex stockholders would receive their choice of $2.47 in cash, or 0.6272 of a Hecla share, or $0.8411 in cash and 0.4136 of a Hecla share for each share of Klondex common stock, subject to proration (the "Transaction"). Klondex would also receive shares in a new company, Havilah Mining Corporation ("Havilah") formed to hold Klondex's Canadian assets, including mines that would be spun-off from the Company as part of the Transaction. The Transaction had an equity value of approximately $462 million.

2.       On May 23, 2018, Klondex filed a Preliminary Proxy Statement on a Schedule 14A with the SEC. On June 12, 2018, Defendants caused Klondex to file a Definitive Proxy Statement (the "Proxy"), announcing that the Klondex shareholder meeting to vote on the Transaction would be held on July 12, 2018. The Proxy was materially deficient and misleading because, *inter alia*, it fails to disclose material information regarding (i) the financial projections for the Company, and Hecla, which were prepared by Company management and/or relied upon by GMP Securities, L.P. ("GMP"), INFOR Financial, Inc. ("INFOR"), and Maxit Capital L.P. ("Maxit"), the Company's financial advisors, and (ii) the financial analysis performed by GMP, INFOR, and Maxit to support their opinions on the fairness of the Transaction. Without

additional information the Proxy was materially misleading in violation of federal securities laws.

3.      On July 12, 2018, the Company held its annual and special meeting of stockholders at which the stockholders relied upon the materially incomplete and misleading Proxy in approving the Transaction by stockholder vote.  On July 20, 2018, Hecla completed the acquisition of Klondex, acquiring all of the issued and outstanding shares of Klondex in exchange for $153,205,757 in cash and 75,276,176 shares of Hecla common stock.  Klondex then changed its name to Klondex Mining Unlimited Liability Company and became a wholly owned subsidiary of Hecla.  Klondex stockholders were also to receive 0.125 of a common share of Havilah, a company formed for the purposes of spinning out Klondex's Canadian assets.

4.      By unanimously approving the Transaction and authorizing the issuance of the Proxy, the Individual Defendants participated in the solicitation even though they knew, or should have known, that the Proxy was materially false and/or misleading. The Proxy was an essential link in accomplishing, and receiving stockholder approval for, the Transaction.

5.      For these reasons and as set forth in detail herein, the Individual Defendants have violated federal securities laws.  Accordingly, Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) because Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

7.      Personal jurisdiction exists over each defendant either because the defendant conducted business in or maintained operations in this District, or is an individual who is either

present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Klondex maintained its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES AND RELEVANT NON-PARTIES

9.      Plaintiff was at all relevant times, the owner of shares of common stock of Klondex.

10.      Klondex was organized and existing under the laws of the Canadian Province of British Columbia.  It maintained its principal place of business in the United States at 6110 Plumas Street, Suite A, Reno, Nevada, 89519.  Klondex's common stock was listed for trading on the New York Stock Exchange under the ticker symbol "KLDX."

11.      Defendant Rodney Cooper ("Cooper") served as a director of the company since 2012.

12.      Defendant Mark Daniel ("Daniel") served as a director of the Company since 2015.

13.      Defendant Richard J. Hall ("Hall") served as a director of the Company since 2014 and is the Chairman of the Board.

4

14.     Defendant Jamie Haggarty ("Haggarty") served as a director of the Company since 2012.  Haggarty currently serves as a director of Havilah.

15.     Defendant Paul Andre Huet ("Huet") served as a director and the Chief Executive Officer of the Company since 2012.  Huet currently serves as a director of Havilah.

16.     Defendant William Matlack ("Matlack") served as a director of the Company since 2012.

17.     Defendant Charles Oliver ("Oliver") served as a director of the Company since 2015.

18.     Defendant Blair Schultz ("Schultz") served as a director of the Company since 2012.  Schultz currently serves as the Chairman of the Havilah board of directors and as the interim CEO.

19.     Defendants referenced in ¶¶ 12 through 19 are collectively referred to as the "Individual Defendants" or the "Board."

20.     Relevant non-party Hecla is a corporation organized under the laws of the State of Delaware. Hecla has its principal place of business at 6500 North Mineral Drive, Suite 200, Coeur d'Alene, Idaho, 83815.

21.     Relevant non-party Merger Sub was a wholly-owned subsidiary of Hecla and organized under the laws of the Province of British Columbia. Merger Sub was created solely for the purpose of effectuating the Transaction.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action as a class action on behalf of all persons and/or entities that owned Klondex common stock (the "Class") as of the record date for the Klondex stockholder meeting, May 15, 2018.  Excluded from the Class are Defendants and their affiliates,

immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

23.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.   The Proxy states that, as of May 15, 2018, there were approximately 180,079,072 shares of common stock outstanding.   All members of the Class may be identified from records maintained by Klondex or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

24.     Questions of law and fact are common to the Class, including (i) whether Defendants solicited stockholder approval of the Transaction through a materially false or misleading Proxy in violation of federal securities laws; (ii) whether Plaintiff and other Class members have suffered damages as a result of the materially false and misleading Proxy and as a result of the Transaction.

25.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

26.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

27.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## FURTHER SUBSTANTIVE ALLEGATIONS

### Company Background and the Transaction

28.     Klondex, founded in 1975, conducts exploration and mining operations throughout North America.  At the time of the Merger Agreement, Klondex controlled two of the highest grade gold mines in operation today, Klondex produced 107,861 gold equivalent ounces in 2014.  At the time of the Transaction, the Company had 100% ownership interests in four mines in Nevada, as well as a 100% interest in the True North gold mine and mill in Manitoba, Canada.

### The Flawed Process Leading Up to the Announcement of the Merger

29.     During the fall of 2017, Klondex received unsolicited expressions of interest from mining companies, including Hecla, that sought to perform exploratory due diligence with an eye toward a strategic transaction.  The Klondex Board reviewed these proposals and approved entry into confidentiality agreements with an unknown number of parties, including Hecla, on November 15, 2017, to permit due diligence.

30.     In the middle of November 2017, an unnamed Klondex investor submitted an unsolicited non-binding term sheet to Defendant Huet to purchase 10 million Klondex shares at a price of C$3.00 per share, an approximate discount of 8% given the then-trading price of Klondex common stock.

31.     The Board met to consider the proposal on November 20, 2017 and concluded that, given the short time-frame proposed by the Klondex investor, the Company had sufficient cash on hand and future cash flows to make financing in the form of the private placement sought by the unnamed Klondex investor unnecessary.

32.     Nevertheless, the Klondex Board determined to evaluate other potential strategic equity investors for private placements in the Company, but that such a private placement should not be rushed and instead be carefully considered and negotiated.

33.     As a result of this determination, the Board directed Klondex management to engage GMP Securities, L.P. ("GMP") and INFOR Financial, Inc. ("INFOR") to seek out potential strategic equity investors.

34.      On November 21, 2017, Hecla was granted access to a digital data room that contained overview data about Klondex's assets under the November 15, 2017 confidentiality agreement.

35.     Between December 2017 and January 2018, GMP and INFOR contacted a number of potentially interested parties regarding a strategic equity investment in Klondex, which led to the execution of confidentiality agreements with two additional parties.

36.     On January 22, 2018, Hecla retained CIBC World Markets, Inc. ("CIBC") and J.P. Morgan Securities LLC ("J.P. Morgan") as financial advisors for a potential transaction with Klondex.   The next day, CIBC contacted GMP and INFOR to advise that Hecla was contemplating a proposal.   The same day, Hecla informed Klondex management that a proposal was forthcoming. Klondex management responded that it was currently interested in a non-controlling equity investment, and that any acquisition proposal would require a significant premium to the market price of Klondex stock.  Klondex management asked GMP and INFOR to provide an evaluation of strategic alternatives and an opinion as to the fairness of the consideration of any transaction.

37.      On January 24, 2018, Hecla delivered a proposal letter to Klondex (the "Initial Proposal Letter") that proposed an acquisition of all issued and outstanding Klondex common

stock at a purchase price of $3.35 per share, representing a 44.1% premium to Klondex's January 23, 2018 closing price.  The proposal expired on January 29, 2018 and contained a binding 30 day exclusivity period.

38.     The Klondex Board met on January 26, 2018 to consider the Initial Proposal Letter.  During this meeting, Klondex management requested that GMP and INFOR conduct a "market check," but only of those entities that were currently conducting due diligence on Klondex to determine whether these entities might submit a proposal.   Yet GMP and INFOR then advised that they believed if Klondex performed a broader market check for other potential buyers, that Hecla would withdraw its proposal and that no other party was likely to submit an offer with a competitive premium.

39.     At the advice of GMP and INFOR, the Board determined not to conduct a broader market check and to pursue the Hecla proposal subject to an increase in consideration to US$3.50 per share, a lower termination fee, a reverse break-up fee in favor of Klondex under certain circumstances, confirmatory due diligence of Hecla, and a US$15 million line of credit from Hecla.

40.     The Board also formed an independent committee of directors, and appointed Defendants Hall, Cooper, Oliver, and Schultz.

41.     On January 28, 2018, the Klondex Board instructed GMP and INFOR to submit Klondex's proposed revisions to the Initial Proposal Letter.

42.     The next day, CIBC delivered a revised proposal letter (the "Revised Proposal Letter") with a proposed purchase price of US$3.44 per share, a small reduction of the termination fee, an equal reverse break-up fee payable to Klondex under certain conditions, and an exclusivity period until February 25, 2018.

43.     A meeting of the Klondex Board was called on January 30, 2018 to consider the Revised Proposal Letter.   After a "detailed discussion," the Klondex Board adjourned the meeting to permit the Independent Committee to review the Revised Proposal Letter.

44.     Despite its purpose to avoid potential conflicts that the full Board might have, the Independent Committee invited the other members of the Klondex Board to join the meeting.

45.     After more discussion during the meeting of the Independent Committee, the Independent Committee met *in camera* and agreed to recommend the execution of the Revised Proposal Letter.

46.     The Klondex Board reconvened its meeting and resolved that Klondex should execute the Revised Proposal Letter.   Following the meeting, Klondex Executed the Revised Proposal Letter with Hecla.

47.     The Independent Committee met again on February 10, and 12, 2018 to select an independent financial advisor to the Independent Committee.   It interviewed two potential candidates, and engaged Maxit Capital L.P. ("Maxit") effective February 12, 2018.

48.     On February 11, 2018, Mr. Baker met with Mr. Hall to discuss the details of the potential transaction between Hecla and Klondex, including the spin out of Klondex's Canadian assets into a new company (Havilah) because Hecla was not interested in the Canadian assets. The two agreed that such a spinout would prolong the time needed to structure and complete a transaction, and that the Klondex Board would have to consider a variety of factors in the spinout, including the governance of Havilah, the consideration allotted to Klondex and Havilah, and any investment by Hecla into Havilah.

49.     During February 2018, the trading price of Klondex stock declined sharply, and much of the negotiation during the exclusivity period concerned a revision to the proposed consideration.

50.     On February 25, 2018, the Klondex Board and the Independent Committee agree to extend the Hecla exclusivity period until March 5, 2018.

51.     At the end of February, the Chairman and Chief Executive Officer of another mining company contacted Defendant Huet regarding a potential merger of equals. Due to the exclusivity agreement, Defendant Huet did not discuss this potential merger.

52.     Defendant Huet was contacted again in early March 2018 by the CEO of another mining production company to discuss a potential acquisition of Klondex, and again, Defendant Huet did not entertain such discussions due to the exclusivity agreement.

53.     The Klondex Board discussed these proposals with its advisors, and decided that a merger with a party other than Hecla would take a significant amount of time, and that a merger of equals might not address the financial issues faced by the Company at the time.  As a result, the Klondex Board declined to even explore either proposal.

54.     After further negotiation, on March 5, 2018, CIBC delivered a revised draft of the Revised Proposal Letter (the "Second Revised Proposal Letter") to GMP and INFOR.  The Second Revised Proposal Letter proposed an aggregate purchase price equal to US$507 million, including merger consideration of US$2.66 per share, an extension of exclusivity to March 12, 2018, and reciprocal break-up fees equal to 3.9% of the equity value of a transaction.  The Second Revised Proposal Letter ascribed a value of US$70 million to Havilah and provided for Hecla to subscribe to US$5 million of Havilah common shares.

55.     The Klondex Board met the next day, along with the Independent Committee, to discuss the Second Revised Proposal Letter.  After discussion, GMP and INFOR indicated that the valuation of Havilah was too high, but that it would be reasonable to request an increased price.  The Independent Committee recommended to the Klondex Board that Klondex negotiate an increased price of US$555 million, including the value of Havilah, and agree to the extended exclusivity period.

56.     On March 7, 2018, Mr. Hall contacted Mr. Baker to communicate the proposed changes to the Second Revised Proposal Letter.

57.     The next day, March 8, 2018, CIBC delivered another revised proposal letter (the "Final Proposal Letter") that contemplated an increase of the purchase price to US$515 million, representing a purchase price of US$2.71 per share, payable in the form of Hecla shares and cash totaling US$470 million, and Havilah shares with an ascribed value of US$45 million.

58.     A meeting was called of the Independent Committee and the Klondex Board on March 9, 2018 to discuss the Final Proposal Letter.  The same day, GMP and INFOR reached out to two institutional stockholders of Klondex, holding approximately 23.60% of the issued and outstanding Klondex shares to discuss the broad terms of the Final Proposal Letter.  These shareholders were supportive of the Transaction.

59.     The Independent Committee and Klondex Board both agreed to execute the Final Proposal Letter, and the Company did so following the meeting.

60.     Following the March 9, 2018 meeting, the two companies continued to negotiate and discuss the remaining terms of the Merger Agreement.

61.     On March 16, 2018, a meeting of the Klondex Board was held at which they received an update of the negotiations process.

62.     The full Klondex Board then adjourned to permit the Independent Committee to consider the terms of the Merger Agreement and receive the fairness opinion of Maxit.  The Independent Committee unanimously agreed to recommend entrance into the Merger Agreement to the Klondex Board.

63.     Following the meeting of the Independent Committee, the Klondex Board reconvened and resolved to accept the oral fairness opinion of GMP Securities, to enter into the Merger Agreement, and to recommend that Klondex stockholders vote in favor of the Merger Agreement.

64.     Klondex, Hecla, and Merger Sub executed the Merger Agreement on March 16, 2018.

***The Merger is Announced and Consummated***

65.     On March 19, 2018, Hecla and Klondex issued a joint press release announcing the signing of the Merger Agreement, reading in relevant part:

> Hecla Mining Company (NYSE: HL) (Hecla) and Klondex Mines Ltd. (NYSE: KLDX) today announced Hecla will acquire all the outstanding shares of Klondex, a high-grade Nevada underground gold producer with its Fire Creek, Midas and Hollister mines, through a plan of arrangement (the Transaction). Klondex's Canadian assets will be spun out to its existing shareholders.
>
> Under the Transaction, Hecla will acquire Klondex for consideration of US$462 million with a mix of cash and shares of Hecla common stock and the newly formed company (Klondex Canada). Klondex's shareholders will receive US$2.47 per share in cash or shares of Hecla, which represents a 59% premium to Klondex's 30-day volume-weighted average price, as at March 16, 2018, on the NYSE American.
>
> "Opportunities to acquire significant land packages along Nevada's prolific gold trends are very rare. Rarer still are for these land packages to have the highest grade mines in the U.S. and this transaction is consistent with Hecla's strategy of owning large prospective land packages with mines where we can improve costs, grow reserves and expand production," said Phillips S. Baker, Jr., Hecla's President and CEO. "We structured the deal to use our excess cash

13

balances so our shareholders can benefit from the approximately 162,000 gold equivalent ounces a year of production while minimizing dilution."

Mr. Baker continued, "One of our core strengths is operating high-grade, narrow-vein underground mines, and Klondex's three operating mines – Fire Creek, Midas and Hollister – are some of the highest-grade gold mines in the world. After extensive due diligence, we see significant opportunity to improve costs, throughput and recoveries over time with our expertise. The combined approximately 110 square mile land position offers the opportunity to make discoveries and grow the reserve base as we improve our knowledge of the geology, something we have done at our other operations. We expect this transaction to be accretive on many important financial and credit metrics, with potentially significant synergies. We are pleased that two significant Klondex shareholders have committed to support this transaction, and look forward to welcoming other Klondex shareholders to our company."

"This transaction is an excellent outcome for Klondex and our shareholders, delivering premium value and a clear pathway to develop and optimize the Nevada mining assets and create further value in the future," said Paul Huet, Klondex's President and CEO. "Hecla has a proven track record of developing and optimizing mining assets such as ours, and has a strong balance sheet that should help Fire Creek and our other properties reach their full potential. Hecla operates a diverse portfolio of some of the highest-grade mines in the world, and the addition of our assets strengthens the portfolio further. We are delighted to enter into this agreement and the Klondex board unanimously recommends that Klondex shareholders vote in favour of this transaction."

**A Further Transformation of Hecla**

- **Seven large land positions located in Alaska, Quebec, Nevada, Mexico and Idaho** – Some of the safest and most prolific mining jurisdictions in the world.
- **Proven operational excellence to be leveraged across expanded portfolio of high-grade mines** – Hecla has an extensive track record of optimizing acquired assets as demonstrated at Casa Berardi and Greens Creek. Hecla's expertise in narrow-vein mining and mill optimization will be applied to the acquisitions to improve the operational consistency and enhance the value of the expanded portfolio.
- **Well capitalized pro-forma company with strong cash flow and solid balance sheet** – Hecla expects to improve financial metrics with the Nevada mines' cash flow.
- **Significant production base with highly prospective growth opportunities and cost reductions** – Adds about 162,000 oz of annual gold equivalent production. Hecla will launch a significant

exploration program at Fire Creek and at the prospective Hatter Graben discovery at Hollister.

- **Increased precious metals production** – Peer group leading pro-forma production profile amongst intermediate precious metal producers of 762koz AuEq (2017A) or 54.1moz AgEq and commodity distribution of 30% Ag, 50% Au, 15% Zn and 5% Pb (by revenue).

**Benefits to Hecla Shareholders**

- Adds significant land position with extensive exploration and development potential, and production in Nevada, one of the most prolific gold mining jurisdictions in the world.
- Increases pro-forma 2017 annual production by 27%, equating to 162koz on a gold equivalent basis or 11.5 million ounces on a silver equivalent basis.
- Fire Creek is a cornerstone producing asset with robust cash flows and significant opportunities for exploration, mine life expansion, and increased throughput.
- The Transaction is structured to minimize dilution and is expected to be accretive on most important financial and operating metrics.
- Allows Hecla the opportunity to capture meaningful synergies.
- Further increases the grade of one of the highest-grade asset portfolios in the industry.
- Klondex's assets leverage Hecla's core competency in narrow-vein underground mining.

**Benefits to Klondex Shareholders**

- Immediate and significant premium of approximately 59% based on the 30-day volume weighted average price and approximately 72% based on closing prices on March 16, 2018, with ongoing participation in upside through Hecla shares and through Klondex Canada shares.
- Superior financial strength and flexibility to support critical development and exploration programs for Klondex's assets.
- Hecla is well capitalized, with a lower cost of capital, making possible critical development and exploration programs for Klondex's assets.
- Proven track record of successfully acquiring and optimizing underground assets.
- Superior investment with enhanced liquidity and a far more diversified production and financial base.
- Hecla has extensive experience operating efficient underground mines for over 125 years.
- Ownership in Klondex Canada, a gold company created to leverage Klondex's exploration expertise and significant mining infrastructure assets in Canada.

**Klondex Canada**

Klondex is pleased to be forming Klondex Canada. Certain members of Klondex's board and management team will continue on at Klondex Canada. Hecla will subscribe for US$7.0 million of common shares of New Klondex in exchange for a 13.46% equity interest, based on a pre-investment Klondex Canada valuation of US$45 million. Klondex Canada intends to make an application to list its shares on the TSX-V.

**Terms of the Transaction**

Klondex shareholders may elect to receive either US$2.47 in cash (Cash Alternative) or 0.6272 of a Hecla share (Share Alternative), each full Hecla share being currently valued at US$3.94, subject in each case to pro-ration based on a maximum cash consideration of US$157.4 million and a maximum number of Hecla shares issued of 77.4 million. If all Klondex shareholders elect either the Cash Alternative or the Share Alternative, each Klondex shareholder would be entitled to receive US$0.8411 in cash and 0.4136 Hecla shares. Klondex shareholders may also elect to receive US$0.8411 in cash and 0.4136 of a Hecla share and Klondex shareholders who fail to make an election will automatically receive US$0.8411 in cash and 0.4136 of a Hecla share. Klondex shareholders will also receive shares of a newly formed company (Klondex Canada) which will hold Klondex's Canadian assets, including the True North and Bison Gold Resources properties.

At closing existing Hecla and Klondex shareholders will own approximately 83.8% and 16.2% of Hecla's outstanding common stock, respectively.

**Major Shareholder Support**

CI Investments Inc. and Sentry Investments Inc., which together hold approximately 42.5 million shares of Klondex, representing approximately 23.7% of Klondex's issued and outstanding shares, have entered into support agreements with Hecla, agreeing to vote their Klondex shares in favour of the Transaction. Each of Klondex's directors and officers have also entered into an agreement to support the Transaction and the Board of Directors of Klondex has unanimously recommended that Klondex's affected securityholders vote in favour of the transaction.

**Board of Directors' Recommendations**

The Transaction has been unanimously approved by the Board of Directors of each of Klondex and Hecla. The Board of Directors of Klondex unanimously recommends that Klondex's affected securityholders vote in favour of the Transaction.

GMP Securities L.P. and INFOR Financial Inc. have each acted as financial advisors to Klondex with GMP Securities L.P. and Maxit Capital LP having provided fairness opinions to the Board of Directors of Klondex and the Independent Committee of the Board of Directors of Klondex, respectively. CIBC World Markets Inc. and J.P. Morgan have each acted as advisors to the Board of Directors of Hecla and have provided fairness opinions to Hecla's Board of Directors.

Each of the directors and senior officers of Klondex, who as of the date hereof, collectively hold approximately 1.7% of Klondex's issued and outstanding common shares have entered into agreements to support the Transaction.

**Transaction Conditions and Timing**

The Transaction will be implemented by way of a Court-approved plan of arrangement under the Business Corporations Act (British Columbia) and will require the approval of: (i) 66 2/3% of the votes cast by the holders of Klondex's common shares, (ii) 66 2/3% of the votes cast by the affected securityholders of Klondex voting as a single class, and (iii) if applicable, a majority of the votes cast by the holders of Klondex's common shares after excluding any votes of Hecla and other persons required to be excluded under Canadian Multilateral Instrument 61-101 Protection of Minority Security Holders in Special Transactions, all at a special meeting to consider the Transaction.

The completion of the Transaction will also be subject to applicable regulatory approvals and closing conditions customary in transactions of this nature. The Arrangement Agreement provides for customary deal-protection provisions, including a non-solicitation covenant on the part of Klondex and a right for Hecla to match any superior proposal. The Arrangement Agreement includes a termination fee of US$21 million, payable by Klondex or Hecla, under certain circumstances.

It is anticipated that the special meeting of Klondex shareholders to consider the Transaction will be held in June 2018. The Transaction is expected to close in the second quarter of 2018.

66.   On July 12, 2018, the Company held its annual and special meeting of stockholders at which the stockholders relied upon the materially incomplete and misleading Proxy in approving the Transaction by stockholder vote.  On July 20, 2018, Hecla completed the acquisition of Klondex, acquiring all of the issued and outstanding shares of Klondex in exchange for $153,205,757 in cash and 75,276,176 shares of Hecla common stock.

17

*The Inadequacy of the Merger Consideration*

67.     The Proxy issued in accordance with Securities and Exchange Act Section 14(a) misrepresented and omitted material facts in order to persuade Klondex stockholders to vote in favor of the Transaction.   In fact, the Merger Consideration did not represent fair value for Klondex stockholders and the misleading Proxy led to stockholder approval of the transaction and immediate damages to Klondex stockholders.

68.     Although the Company's stock price had dipped at the time of the announcement of the Transaction, the consensus price target from equity analysts remained above the Merger Consideration, at $2.35 per share.  Therefore Klondex stockholders received no premium to the price that the most knowledgeable and experienced analysts believed that Klondex should have reached had the Transaction not taken place.

69.     The Transaction also occurred at the worst possible time, immediately after a substantial decline in the share price and consensus price target.  Klondex common stock traded above $5.00 per share until the middle of 2017, and above $2.00 per share until February 2018. Furthermore, the equity analyst consensus price target remained above $5.00 per share until February 2018.

70.     The Company recognized this temporary decline, but directly made its case to stockholders in the lead up to the Merger Agreement.

71.     For example, in the Company's press release regarding the company's financial results for the fiscal fourth quarter and year 2017, on March 15, 2018, - four days before the announcement of the Merger Agreement - it reported the mining of 222,233 gold equivalent ounces ("GEOs") in the year 2017, and produced 189,456 GEOs, an increase of 17% compared to the 161,289 GEOs produced in 2016.  Of those GEOs, 190,409 were mined in Nevada, with

161,536 produced.   The only reason that these Nevada mines produced less ore than the previously-issued guidance had predicted was the decision to defer processing of most of the ore for metal recovery optimization.

72.   In the True North mine in Canada, the Company milled 216,978 tons of ore, producing 24,636 GEOs.  It also milled 80,848 tons from the True North tailings,[1] producing an additional 3,285 GEOs.

73.   Defendant Huet said of the results, "[t]he Company produced more ounces and generated more revenue during 2017 than any year in the organization's history."  He added that the "Company is in an enviable position by owning outstanding assets in one of the best mining jurisdictions of the world."

74.   During a conference call following the issuance of this press release, Defendant Huet and Michael Doolin informed analysts that the Company expected the production in 2018 to be in line with 2017 results, but at an improved cost.

75.    And the Company was not limited by its then-operating mines, as Huet noted that "[o]ur vast land package has also demonstrated incredible near-mine exploration potential."

76.   These financial results and the operational performance reflected thereby are nothing new. Indeed, in a November 9, 2017 press release announcing the Company's financial results for the third quarter 2017, Defendant Huet commented: "[a] significant accomplishment was reached during the third quarter as we began processing Hollister ore through the Midas mill for the first time . . . . We are making significant progress in ramping up True North and Hollister to full production." What is more, according to the Company's August 9, 2017 press

---

[1] Mine tailings are the materials left over after the process of separating the valuable fraction from the uneconomic fraction of ore.   Additional minerals may be recovered from tailings through reprocessing.

release announcing its financial results for the second quarter 2017, the Company generated "$30.0 million of operating cash flow in Q2 2017 compared to $15.4 million a year ago quarter, an increase of approximately 95%" (emphasis added). In commenting on these results, Defendant Huet stated:

> Our Q2 2017 operational and financial performance was the strongest in the Company's history. Our core assets in Nevada continued to perform exceptionally well and, as a result, have allowed us to increase our consolidated production guidance for the year at slightly lower costs. Additionally, we have continued to maintain strong liquidity and a healthy balance sheet, ending the quarter with over $40 million in cash.

77.    Klondex thus had a bright future, all indications demonstrating substantial growth in its cash flows year-over-year.

78.    Rather than continue as a standalone company and maximize value to existing stockholders, the Board misled stockholders into a merger with Hecla for inadequate consideration.

79.    Analysts noted that the deal would likely prove disappointing to Klondex stockholders in the long-term.  H.C. Wainwright & Co., in particular, downgraded the Company from Buy to Neutral, stating that it was "disappointed" in the pricing of the Transaction.

80.    The Board undervalued the Company's own assets and overvalued Hecla stock in accepting the fairness opinion of GMP, and materially misled stockholders as to the value of the Merger Consideration and the value of Klondex stock when summarizing and describing the analyses conducted by GMP and Maxit in support of their respective fairness opinions.

***The Materially Misleading and Incomplete Proxy***

81.    Defendants failed to provide stockholders with material information necessary for an informed vote on the Transaction.  The Proxy, which recommended that the Company's

stockholders vote in favor of the Transaction, misrepresented and/or omitted material information in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *Misleading Statements and Omissions Regarding Financial Projections*

82.     Defendants caused the Proxy to omit material information concerning the Company's financial projections, misleading Klondex stockholders.

83.     Company management provided its financial projections to the Board, Maxit, INFOR, and GPM during the process leading up to the execution of the Merger Agreement. These projections were relied upon by Maxit, INFOR, and GPM in the issuance of fairness opinions touted to Company stockholders, as well as by the Independent Committee and the Board who approved the Transaction.

84.     Maxit was provided with, and relied upon, "internal management forecasts, development and operating projections, estimates (including future estimates of mineable resources) and budgets prepared or provided by or on behalf of Klondex and Hecla."  Proxy at 89.

85.     Maxit then used the projected unlevered, after-tax free cash flows of the Company, excluding Havilah, to perform a net asset value ("NAV") analysis of the Company (the "*NAV Analysis*").  "The NAV analysis was comprised of: (a) a discounted cash flow analysis for mining assets and corporate costs where financial forecasts could reasonably be estimated by management of Klondex; (b) a carrying value assigned to certain mining assets where financial forecasts could not be reasonably estimated by management of Klondex; and (c) the book value of cash and other current assets less the book value of debt and other current liabilities as of December 31, 2017, as applicable."  Proxy at 93.  This *NAV Analysis* evaluates the present value of future cash flows, as well as the Company's other assets and liabilities, to determine the

present value of the entire Company and a range of fair values for the Company's common stock.

86.     Maxit observed a model NAV per share, excluding Havilah, of US$2.05 per share.  This value fell below the median equity research analyst NAV per share, adjusted for Havilah, of US$2.23 per share.  Proxy at 94.

87.     At the same time, Maxit was provided with a NAV analysis of Hecla, performed by Hecla management, which valued Hecla at US$4.10 per share.  In contrast, the median equity analyst NAV per share of Hecla was only US$2.50.

88.     The Proxy disclosed only certain projections of the unlevered, after tax free cash flows used by Maxit to prepare this model NAV per share for Klondex, and none of the projections used in calculating the NAV per share for Hecla.  The Klondex projections disclosed include cash flows for only three of the Company's mines, Fire Creek, Midas, and Hollister for the years 2018 through 2030.  These limited disclosures omit material information that misleads Klondex stockholders as to the fair value of their shares and the adequacy of the Merger Consideration.

89.     Rather than provide a summary of the projections provided to Maxit for the full Company, which Maxit used to value the entire Company other than the Havilah portion, the Proxy discloses only the cash flows for three individual mines:

**Unlevered, After-tax Free Cash Flows for the Years Ending December 31, (in millions of US$)**

| Mining Operation | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fire Creek | 57.4 | 44.5 | 37.6 | 35.6 | 28.8 | 7.2 | (1.8) | — | — | — | — | — | — |
| Midas | 2.8 | 9.4 | 11.7 | 12.3 | 12.3 | 12.4 | 12.4 | 12.4 | 12.4 | 12.4 | (4.8) | (11.5) | — |
| Hollister | 0.5 | 0.4 | (5.8) | 2.6 | 19.1 | 19.1 | 19.1 | 19.1 | 19.1 | 19.1 | 18.6 | 3.3 | (4.0) |

90.     These projections misled Klondex stockholders regarding the value of the entire Company.  For example, in its summary of Maxit's *NAV Analysis*, the Proxy states that the

analysis comprised "a discounted cash flow analysis for mining assets and corporate costs where financial forecasts could reasonably be estimated by management of Klondex," as well as the carrying value assigned to those mining assets whose forecast could not be reasonably estimated, and the book value of cash and other current assets less the book value of debt and other current liabilities.

91.     The disclosed financial information in the Company's most recent 10-K immediately makes the misleading nature of these selective disclosures clear.  While financial results are provided for each of the three disclosed mines, Fire Creek, Midas, and Hollister, the consolidated mining operations for the entire Company are also disclosed, as are Company-wide financial metrics for various costs and gains.

92.     Furthermore, an analysis of this Form 10-K reveals financial results for an entire Nevada operating mine with undisclosed projections, the Aurora mine located in Nevada. This mine has substantial operations, and as noted by the 10-K, holds promise for future mining: "certain of our executives and management previously operated Aurora and believe that exploration targets with significant potential exist within the property boundary. We believe Aurora provides us with an opportunity to strategically and responsibly grow our business in Nevada."

93.     Of these items making up the *NAV Analysis*, only a portion of the first, the forecasts for cash flows of selected existing mining assets, are disclosed. The carrying value of other assets was not disclosed, nor corporate costs, nor the book value of current assets and liabilities.  For example, the Form 10-K previously disclosed that the Company's production-related inventories of gold and silver ounces totaled $35.9 million that could be generated from their sale.  This is Company-wide inventory that is not disclosed in the *NAV Analysis*, and

projections of future changes in these inventories are also omitted. But these inventories change drastically from year-to-year as the Company produces more ounces than it can sell or vice versa.  According to the Company's Consolidated Balance Sheets in the 2017 Form 10-K, as of December 31, 2017, the Company held $42 million in Inventories, compared with only $21 million in Inventories as of December 31, 2016.

94.     Thus the projected cash flows of the mines are not representative of the projected assets of the entire Company and materially misled Klondex stockholders as to the total value of the Company.

95.     Without these disclosures, Defendants cherry-picked the disclosed projections and materially misled Klondex stockholders, rendering the financial analyses of Maxit, INFOR, and GPM misleading, or at best, meaningless.

### Misleading Statements and Omissions Regarding Havilah

96.     After Klondex's management and Board discovered that Hecla was uninterested in purchasing the entirety of the Company's Canadian assets, they decided to prioritize the sale of the Company's U.S. assets over ensuring that Klondex stockholders received fair value in the spin-off of Havilah.

97.     While Maxit used the mutually agreed-upon valuation of Havilah, US$45 million based on the US$7 million subscription by Hecla, no actual financial information was provided regarding these assets.

98.     The Proxy omitted any forecasts for the future cash flows of Havilah, the spun-off Canadian mining operations of the Company, despite Maxit and the other financial advisors relying on "Klondex Management's own internal views" of the value of these operations. These omitted projections included all financial projections for the Klondex assets spun out as Havilah.

99.     The 2017 Form 10-K disclosed that the True North mine that represents most of Havilah's assets produced revenues of US$32.5 million.  While Company management decided to place True North under care and maintenance in January 2018, the mine still had optionality at higher metal prices, exploration potential, and tailings to be processed.

100.    Projections for Havilah's other assets were also omitted, including the Ogama-Rockland property acquired in 2017.

101.    As noted by Havilah's Interim Management Discussion and Analysis ("MD&A") for the Nine Months Ended September 30, 2018, filed on November 26, 2018, Klondex failed to explore its Q4 2017 acquisition of the Ogama-Rockland property in Manitoba because of its focus on the Hecla transaction.  Havilah has hired a Vice President of Exploration to survey and research this property, Dr. Scott Anderson, "to begin compiling various historic work that has been neglected by prior operators Klondex and San Gold, as their focus was spent on the operating mines. Dr. Anderson has already generated several new targets to test on the company's extensive land package."

102.    Located only 26 kilometers southeast of the True North mine, Ogama-Rockland produced 45,440 ounces of gold between 1948 and 1951.  While not under current operation, this area has significant potential.

103.    The Proxy explicitly states that Klondex Management's internal view of the Havilah valuation was less favorable, leading Klondex stockholders to believe that Hecla was overpaying for its interest in Havilah.  Despite these internal views on the valuation, the Proxy does not quantify Klondex Management's valuation of the Havilah assets.

104.    This actively misleading description of the overvaluation of the Havilah assets has been belied by two private placements of Havilah common shares and warrants.  Both private

placements were purchased entirely by Havilah's senior management, its board of directors including Defendants Huet, Haggarty, and Schultz, and existing partners with working relationships to the Company.  On September 19, 2018, Havilah announced that it closed a non-brokered private placement offering for proceeds of C$960,300, which will be used for the exploration of the Company's assets in Manitoba.  On January 10, 2019, Havilah announced a new private placement that generated proceeds of C$109,725 for general corporate purposes. The warrants issued in both of these placements permit the owner to buy common shares at C$0.50 per share.

105.   Havilah's insiders, including Defendants Huet, Haggarty, and Schultz, had direct access to information about Havilah, and purchased warrants because they believed that the spin-off of Havilah finalized less than six months before had undervalued Havilah.

106.   Defendants materially misled Klondex stockholders as to the true value of the Havilah spin-off by omitting the above information.  This allowed Hecla to acquire a substantial portion of Havilah, rightfully the property of Klondex stockholders, in a sweetheart deal that directly damaged the Class.

### Material Omissions Concerning Maxit's Financial Analyses and Fairness Opinion

107.   The Proxy described the fairness opinion provided by Maxit for the Independent Committee, and in doing so summarized the various valuation analyses it performed in support of this opinion. However, the description of the fairness opinion and analyses failed to include key inputs and assumptions underlying these analyses. Without this information, as described below, Klondex's public stockholders were unable to fully understand these analyses and, thus, were misled as to the weight, if any, to place on the fairness opinion in determining how to cast

their vote on the Transaction. This omitted information, if disclosed, would have significantly altered the total mix of information available to Klondex's stockholders.

108.    The Proxy failed to disclose various material elements of the financial analyses performed by Maxit underlying the fairness opinion provided to the Independent Committee.

109.    The Proxy discloses that Maxit performed a *NAV Analysis* to determine a range of implied values per share for Klondex, excluding Havilah.  This analysis included a discounted cash flow analysis for mining assets and corporate costs, a carrying value assigned to the mining assets where financial forecasts could not be reasonably estimated by Klondex management, and the book value of cash and other assets, less the book value of debt and other liabilities as of December 31, 2017.

110.    The disclosed inputs into the analysis were misleading to Klondex stockholders. As noted above, cash flows were only disclosed with respect to three active mines instead of the entirety of the Company.  While such a disclosure might not be misleading if Klondex was simply selling those mines in an asset sale, the selective disclosure of only those mines in a sale of the entire company misleads stockholders as to the cash flows of the entire company and thus the fair value of the entire company.

111.    The Proxy omits the carrying value assigned to the assets for which forecasts could not be reasonably estimated, as well as the book value of cash and other assets and debt and other liabilities.  The omission of these values by Defendants while providing cash flows generated by other assets misled stockholders as to the value of the entire Company and caused them to accept inadequate merger consideration.

112.    The carrying value of assets can have a significant impact on the NAV per share ascribed to a company. The Proxy acknowledges this when it discloses that Maxit attributed a

NAV per share for Hecla of US$4.10 per share based on Hecla's own analysis in the face of a median equity research analyst NAV per share of US$2.50.  According to the Proxy, Maxit "believed that the variance was primarily driven by the carrying value ascribed to Hecla's development assets based on available equity research analyst reports providing a sum-of-the-parts breakdown of NAV."  Thus the primary driver of more than a third of Hecla management's self-valuation, and thus, analogically a large portion of the NAV per share for Klondex, was an input that Klondex management and Defendants decided to omit from the Proxy.

113.   The presented results of the analysis are also misleading. Rather than disclose the calculated range of implied values per share as a result of this analysis, however, the Proxy merely discloses one value, US$2.05 per share.  There is no indication of the actual range, or where the disclosed value falls within the range.  In doing so, the Proxy discloses a "fair" value that ensured Klondex stockholders would accept inadequate and unfair consideration.

114.   By undervaluing the Company and overvaluing Hecla while misleading investors regarding the analysis, Maxit and Defendants ensured that the implied consideration of US$2.43 looked like an adequate premium to the supposed NAV value of US$2.05 per share.

115.   With respect to Maxit's *Comparable Trading with Control Premium Approach*, the Proxy failed to disclose: (i) the actual P/NAV and P/Cash Flow values determined for each of the comparable companies; (ii) the basis for Maxit's selection of the comparable companies; and (iii) the calculation of the Representative Company Range and Representative Premium Range.

116.   These omissions materially misled Klondex stockholders.  The Representative Company Range for P/Cash Flow, 3.50x – 6.00x, falls within the range of observed multiples for the selected companies.  But the Representative Company Range for P/NAV of 0.60x to 1.00x cannot be reconciled with the observed multiple range of 0.47x to 0.83x for the selected

companies.   The omission of the individual multiples for each of the selected companies is materially misleading in light of the discrepancy between the observed range and the Representative Company Range because the discrepancy calls into question the credibility and competency of Maxit's analyses and fairness opinion.

117.   With respect to Maxit's *Precedent Transaction Approach*, the Proxy failed to disclose the individual P/NAV and P/Cash Flow values for the transactions observed in the analysis, the dates of each transaction observed, and the basis for Maxit's selection for the selected transactions.

118.   The failure to provide multiples like P/NAV and P/Cash Flow misled stockholders as to the spread of the selected multiples, allowing Maxit to select outlier values to skew the fairness analysis.   Thus the Proxy materially misled Klondex stockholders as to the utility of these analyses the fairness of the Merger Consideration.

119.   Finally, the Proxy states under the heading "Klondex Analysis," that "Maxit [] combined the Comparable Trading with Control Premium Approach and the Precedent Transaction Approach, including the transaction premiums analysis, for Klondex to estimate an overall value range for Klondex Shares."   But the Proxy never discloses this value range so that Klondex stockholders never knew where the Merger Consideration fell with respect to this range. Proxy at 96.

### Material Omissions Concerning the GMP and INFOR's Financial Analyses and Fairness Opinion

120.   While the Proxy materially misled Klondex stockholders regarding Maxit's fairness opinion by selectively omitting information, the Proxy omits the entirety of the valuation analyses conducted by GMP and INFOR that supported the fairness opinion provided to the Board.

121.     The Proxy omitted any elements of the financial analyses jointly performed by GMP and INFOR underlying the fairness opinion provided to the full Klondex Board.  The summary is devoid of any inputs or results, despite disclosing that GMP and INFOR provided analyses underlying their fairness opinion delivered to the Board, including a *Trading and Historical Share Price Analysis*, a *Consideration Analysis*, a *Precedent Transaction Analysis*, and a *Comparable Multiple Analysis*.

122.     The Proxy did not even include a range of fair values for either Klondex, Hecla, or Havilah.  This is not a fair summary and materially misled Klondex stockholders as to the reliability of the analyses and conclusions of GMP and INFOR that were relied upon in their opinion as to the fairness of the Merger Consideration.

123.     In omitting the entirety of any useful summary of the analyses performed by the Board's advisors, the Board willfully misled Klondex stockholders that GMP's fairness opinion carried the same weight and credibility as the Maxit fairness opinion, and should be taken as proof of the fairness of the Merger Consideration.  Klondex stockholders assumed that the valuation ranges calculated by Maxit and GMP were identical or similar, when in fact they likely differed drastically given unknown selections of inputs and assumptions by GMP.

124.     Without the material information described above, stockholders could not make an informed decision whether or not to vote in favor of the Transaction, and have been harmed thereby. These omissions materially misled Klondex stockholders as to the accuracy and value of the analyses underlying the fairness opinions of Maxit, or GPM and INFOR, and the veracity of the fairness opinions themselves.

125.     Defendants' failure to provide Klondex's stockholders with the foregoing material information constituted a violation of Sections 14(a) and 20(a) of the Exchange Act, and Rule

14a-9 promulgated thereunder.  The Individual Defendants were aware of their duty to disclose this information.  The material information described above that was omitted from the Proxy took on actual significance in the minds of Klondex's stockholders in reaching their decision whether to vote in favor of the Transaction.  Plaintiff and the other members of the Class were unable to make an informed decision about whether to vote in favor of the Transaction. Accordingly, based on the foregoing disclosure deficiencies in the Proxy, Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## CLAIMS FOR RELIEF

## COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 and 17 C.F.R. § 244.100 Promulgated Thereunder**

126.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

127.    Defendants issued the Proxy with the intention of soliciting stockholder support for the Transaction.

128.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

129.    Specifically, the Proxy violated Section 14(a) and Rule 14a-9 because it was materially misleading in numerous respects and omitted material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants should have known that the

Proxy was materially misleading and omitted material facts that were necessary to render the statements that were made non-misleading.

130.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth.

131.    The misrepresentations and omissions in the Proxy were material to Plaintiff and the Class, and Plaintiff and the Class were deprived of their right to cast a fully informed vote on the Transaction.

132.    These material misrepresentations and omissions in the Proxy caused economic harm to Plaintiff and the Class as they were misled into voting for the inadequate consideration offered in the Transaction.

133.    As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class were harmed.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

134.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

135.    The Individual Defendants acted as controlling persons of Klondex within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Klondex, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and

dissemination of the various statements that Plaintiff contends were materially incomplete and misleading.

136.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

137.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Transaction.  The Proxy at issue contained the unanimous recommendation of each of the Individual Defendants to approve the Transaction. They were, thus, directly involved in the making of the Proxy.

138.    In addition, as the Proxy set forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.   The Proxy purported to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

139.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

140.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons,

these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class were harmed.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)     Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

(B)     Directing the Defendants to account and compensate Plaintiff and the Class for all damages suffered as a result of the Defendants' wrongdoing;

(C)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and costs; and

(D)     Granting such other and further equitable relief as this Court may deem just and proper.

///

///

///

///

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 4, 2019                    **ALDRICH LAW FIRM, LTD.**

By:  /s/ Catherine Hernandez
　　　John P. Aldrich, Esq.
　　　Nevada Bar No. 6877
　　　Catherine Hernandez
　　　Nevada Bar No. 8410
　　　7866 W. Sahara Avenue
　　　Las Vegas, Nevada 89117
　　　702.853.5490 Telephone
　　　702.227.1975 Fax

.                                          *Liaison Counsel*

　　　Donald J. Enright, Esq.
　　　Elizabeth K. Tripodi, Esq.
　　　 LEVI & KORNINSKY LLP
　　　1101 30th Street, N.W., Suite 115
　　　Washington, DC 20007
　　　(202) 524-4290